AO91 (Rev. 12/03)  Criminal Complaint

FILED by _____ _____ D.C.

~~MAY 27~~ 2009

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. PIERCE

# UNITED STATES DISTRICT COURT

SOUTHERN _____ DISTRICT OF _____ FLORIDA

UNITED STATES OF AMERICA
V.

FRANK PIERRE
and
JEAN CLAUDY POLANCO

(Name and Address of Defendant)

## CRIMINAL COMPLAINT

Case Number:  09-46-FJL

I, the undersigned complainant state that the following is true and correct to the best of my knowledge and belief. Between on or about  9/1/08 & continuing until 5/26/09  in  St. Lucie, Broward & Palm Beach  County, in the  SOUTHERN  District of  FLORIDA  defendant(s) did,

*(Track Statutory Language of Offense)*

did knowingly and intentionally combine, conspire, confederate, and agree to possess with intent to distribute a controlled substance, that is, five (5) kilograms or more of cocaine hydrochloride,

in violation of Title  21  United States Code, Section(s)  846 and 841(a)(1) .
I further state that I am a(n)  SPECIAL AGENT  and that this complaint is based on the following facts:

Official Title

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part of this complaint:  ☒ Yes  ☐ No

_____
Signature of Complainant

Tammy Roane, Special Agent FDLE & DEA Task Force Officer
Printed Name of Complainant

Sworn to before me and signed in my presence,

_____
Date  May 27, 2009                              at   FORT PIERCE          FL
                                                     City                State

FRANK J. LYNCH, Jr.
Name of Judge          Title of Judge          Signature of Judge

# AFFIDAVIT
## OF
## TAMMY ROANE
## SPECIAL AGENT
## FLORIDA DEPARTMENT OF LAW ENFORCEMENT

I, Tammy Roane, being duly sworn, depose and state that:

1. I have been employed as a detective with the Florida Department of Law Enforcement (FDLE) since 2002, where I have been involved primarily in investigations targeting significant drug traffickers in Florida. Prior to FDLE, I was a police officer with the Fort Pierce Police Department for approximately eleven years, with the majority of that tenure assigned to the Criminal Investigations Bureau. I have completed multiple schools and in-service training related to the investigation of criminal offenses, particularly drug trafficking. In addition, I have completed a basic Drug Enforcement School, as well as a Narcotic Identification School. I am currently a Task Force Officer with the Drug Enforcement Administration (DEA).

2. As an FDLE Agent, I have participated in numerous drug and money laundering investigations. These investigations involved the use of confidential informants and undercover officers to make controlled drug purchases, physical and wire surveillance, search warrants, grand jury subpoenas, pole cameras, analysis of telephone toll records, pen registers, trap and trace devices, and the interception of wire communications pursuant to court order. To date, I have been involved in approximately fifty electronic surveillance investigations, and have been the affiant on approximately thirty-five wiretap affidavits. Through my training, education, and experience, I am familiar with the manner in which illegal drugs are imported, stored, and distributed, the method of payment for such drugs, efforts of persons involved in such activity to avoid detection by law enforcement, and methods used to finance drug transactions and launder drug proceeds.

1

3.     I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7), and am an officer of a state who is empowered by law to conduct investigations of, and to make arrests for, offenses involving the manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic drugs, marijuana, or other dangerous drugs punishable under the laws of the United States.

4.     This affidavit is submitted in support of a criminal complaint authorizing the arrests of FRANK PIERRE and JEAN CLAUDY POLANCO.  Since this affidavit is being submitted for the limited purpose of establishing probable cause for the arrest of FRANK PIERRE and JEAN CLAUDY POLANCO, I have not set forth every fact known to me regarding this investigation.

5.     On November 19, 2008, FDLE, along with the St. Lucie County Sheriff's Office (SLCSO), State Attorney's Office (SAO), the Bureau of Alcohol Tobacco Firearm (ATF), and the Drug Enforcement Administration (DEA), started a lawful state court-ordered wire intercept on the cellular telephones of Todd Jackson, Jr., Quentin Dixon, and Todd Jackson, Sr.  The wire intercept is one of the investigative tools being used to investigate this cocaine trafficking organization based in St. Lucie County, Broward County, and Palm Beach County, Florida.  The investigation revealed that the St. Lucie County part of the organization was controlled and operated by Todd Jackson, Sr.  The Jackson organization was responsible for the distribution of cocaine, marijuana, and ecstasy tablets to individuals throughout Florida.  Todd Jackson, Sr. and Quentin Dixon were arrested on January 26, 2009, by state authorities for the possession of cocaine hydrochloride in excess of five-hundred (500) grams.

6.     During the course of this investigation, Jackson, Sr.'s source of supply was identified as FRANK PIERRE.  On a number of occasions during the state wiretap, Jackson, Sr.

had coded telephone conversations with PIERRE in reference to delivery dates and prices of cocaine. Jackson, Sr. then contacted Quentin Dixon to assist with the pick-up and transfer of the cocaine to "stash" houses under the control of Jackson, Sr. and/or Quentin Dixon.

7.      Information gathered during the course of the investigation revealed that FRANK PIERRE owns and resides in Broward County at a residence located at 1711 NE 2nd Terrace, Pompano Beach, Florida 33060. Information gathered during the course of this investigation also revealed that PIERRE uses the residence located at 229 NW 9th Street, Pompano Beach, Florida and 612 NE 3rd Avenue, Pompano Beach, Florida as stash houses to facilitate drug transactions. The residences located at 229 NW 9th Street, Pompano Beach, Florida, 612 NE 3rd Avenue, Pompano Beach, Florida, and 1711 NE 2nd Terrace, Pompano Beach, Florida, are approximately one to two miles from one another. Jackson, Sr. and/or Quentin Dixon would purchase their cocaine from PIERRE and then transport the cocaine to their respective identified "stash locations" in St. Lucie County and Brevard County to store the cocaine.

8.      A review of the intercepted telephone calls and a toll analysis of the telephone listings utilized by Jackson, Sr. and Dixon revealed that they communicated on a regular basis with their source of supply FRANK PIERRE. On the following dates, the following telephone conversations between Todd Jackson, Sr. and Quentin Dixon were intercepted pursuant to the state court ordered wire intercept.

        a.      On January 9, 2009, a telephone conversation was heard between Quentin Dixon and Todd Jackson, Sr. Jackson, Sr. stated "He got the word." Dixon replied "What word." Jackson, Sr. stated "Frank" (FRANK PIERRE). The word is keep my money out over the weekend." Dixon replied "Okay." Jackson, Sr. stated "Gonna move late at night. I ain't moving no time in the daytime." Dixon asked "The numbers the same?" Jackson, Sr. replied "Don't know. I getting 52 cent, just in case. Let me see 26 and 26 is 52. I'm gonna get 52 dollars." Dixon stated "I might need you to get half." Jackson, Sr. replied "Oh you can come up with half. I might already have enough for that." Dixon stated "I ain't even

3

trying to go to the water with nothing. I'm gonna get rid of that shit soft. Flip that and go back and get me some more." Based on my training and experience this telephone call is indicative of illegal narcotic activity. The term "26" is street terminology used to mean $26,000 per kilogram of cocaine hydrochloride. The term "water" is street terminology used to mean processing cocaine hydrochloride into crack cocaine.

b.   On January 9, 2009, at approximately 4:39 pm, a conversation was heard between Quentin Dixon and FRANK PIERRE. Dixon asked "What's going on." PIERRE replied "Can't call it." Dixon asked "Still waiting on the word?" PIERRE stated "I'm waiting on Fed-Ex to get to me." Dixon replied "Okay, I'm waiting on you." PIERRE responded affirmatively.

c.   On January 12, 2009, at approximately 7:41 pm, a telephone conversation was heard between Quentin Dixon and FRANK PIERRE. PIERRE stated "The price is 28. That's the way the numbers came." Dixon replied "Okay." Based on my training and experience this telephone call is indicative of illegal narcotic activity. The term "28" is street terminology used to mean $28,000 per kilogram of cocaine hydrochloride.

d.   On January 13, 2009, at approximately 10:48 am, a conversation was heard between Quentin Dixon and FRANK PIERRE. Dixon told PIERRE "I'll be heading your way around 2:00 pm. PIERRE responded affirmatively. At approximately 7:11 pm, Quentin Dixon called PIERRE and asked "Where you want to meet." PIERRE replied "Grab a milk shake and a fry. I'm in Fort Lauderdale. I'll be there shortly."

e.   On January 13, 2009, at approximately 5:45 pm, PIERRE gave Dixon directions to the stash house located at 229 NW 9th Street, Pompano Beach, Florida. Dixon agreed to meet at that location. Surveillance was established prior to Dixon leaving St. Lucie County, and surveillance was able to follow Quentin Dixon from St. Lucie County to 229 NW 9th Street, Pompano Beach, Florida. Lorenza Harriell was identified as being in the vehicle with Dixon prior to their departure from St. Lucie County. Surveillance observed Dixon arriving at 229 NW 9th Street, Pompano Beach, Florida. Surveillance observed PIERRE arrive and enter the residence at 229 NW 9th Street, Pompano Beach, Florida. A short time later, surveillance observed PIERRE return back outside to meet with Dixon. After a brief time, Dixon and Harriell left the area and returned to Fort Pierce, Florida. Surveillance observed the tag number of 307JTW on a vehicle at the 229 NW 9th Street, Pompano Beach, Florida location. A records inquiry with the Department of Highway Safety and Motor Vehicle revealed the tag number of 307JTW to be in the name of FRANK PIERRE.

f.  On January 13, 2009, at approximately 8:50 pm, a conversation was heard between Quentin Dixon and Todd Jackson, Sr. Dixon stated "I'm on my way back." Jackson, Sr. asked "What you got?" Dixon replied "I got seven and Lo (Lorenza Harriell) got nine. I still owe FRANK twelve." Jackson, Sr. replied "I owe FRANK eighteen still."

g.  During the course of this investigation and telephone calls intercepted pursuant to the state wire, PIERRE told Dixon that in order to receive additional amounts of cocaine he (Dixon) must pay the amount he owes for prior sales of "fronted" cocaine.

h.  On January 20, 2009, at approximately 7:05 pm, a conversation was heard between Quentin Dixon and Todd Jackson, Sr. During this conversation, Dixon told Jackson, Sr. "I'm on my way to drop that package off." Jackson, Sr. asked "You gonna take mine too." Dixon replied "I might as well." Jackson, Sr. then stated "When you do it get ready to go get it. He'll be paid. You still have work?" Dixon replied "No." Jackson, Sr. asked "You make forty-two?" Dixon replied "Forty." Jackson, Sr. stated "That's good." Dixon stated "I talk to Frank about doing the same thing for me. I'll be straight then. Frank said maybe this weekend." Jackson, Sr. acknowledged. Dixon stated "This is what we do when he calls. You go ahead and get two and let me do my thing." Jackson, Sr. replied "I was thinking of bringing you the other money. You get me two and a suspect. Put your fourteen in. That means I'm gonna get three and you get a whole." Dixon agreed.

i.  On January 26, 2009, at approximately 10:03 am, a call was heard between Jackson, Sr. and Dixon. Jackson, Sr. told Dixon "he got the word." Jackson, Sr. told Dixon he was going to get two and asked Dixon if he will be getting a "whole" one. At approximately 4:23 pm, a subsequent call was heard between Todd Jackson, Sr. and Quentin Dixon. Again Jackson, Sr. and Dixon agreed on getting "two and one whole ones". Jackson, Sr. and Dixon agreed upon meeting at "Billy's," which has been identified as 5007 Sanibel Avenue, Fort Pierce, Florida.

9.  On January 26, 2009, at approximately 4:00 pm, St. Lucie County agents established surveillance on Dixon. Dixon and an individual identified as Dennis Clark, were surveilled traveling from St. Lucie County to Broward County. During this same time frame, Fort Lauderdale DEA observed PIERRE depart his residence located at 1711 NE 2nd Terrace, Pompano Beach, Florida 33060. St. Lucie County surveillance observed Dixon pull into the parking lot of a sub shop in close proximity of 229 NW 9th Street, Pompano Beach, Florida. St.

5

Lucie County surveillance teams then observed PIERRE arrive at the same sub shop and followed both PIERRE and Dixon to 229 NW 9th Street, Pompano Beach, Florida. St. Lucie County surveillance observed PIERRE enter the residence while both Dixon and Clark remained outside. PIERRE returned within a short period of time and met with Dixon and Clark outside the residence. Surveillance then observed Dixon and Clark leave the residence at 229 NW 9th Street, Pompano Beach, Florida in their vehicle. Surveillance teams then followed Dixon and Clark to 5007 Sanibel Avenue, Fort Pierce, Florida.

10.     On January 26, 2009, at approximately 9:00 pm, Dixon and Clark arrived at and entered the residence at 5007 Sanibel Avenue, Fort Pierce. Todd Jackson, Sr. was also observed arriving and entering the residence at 5007 Sanibel Avenue. Members of the SLCSO Special Investigation Unit executed a state search warrant at 5007 Sanibel Avenue, Apartment A, Fort Pierce, Florida. Quentin Dixon and Todd Jackson, Sr., among others, were found inside the residence. During a search of the residence three (3) kilogram sized packages that field tested positive for the presence of cocaine and a ledger were found. Quentin Dixon and Todd Jackson, Sr. were arrested and read their *Miranda* Rights. Both Dixon and Jackson, Sr. waived their rights and agreed to speak with law enforcement.

11.     Quentin Dixon advised agents that he transported the three (3) kilogram packages of cocaine to the residence and the cocaine came from south Florida. Quentin Dixon stated he only purchased one (1) kilogram of cocaine and the other two (2) kilograms of cocaine did not belong to him. Quentin Dixon stated that for approximately the past year or so he has purchased cocaine and broke it down to ounce quantities for sale. Dixon explained that he did so in order to supplement his income.

12.     On February 25, 2009, SLCSO Detective Andrew Bolonka, DEA Special Agent Randy Matschner, and I conducted an interview of Quentin Dixon, who confirmed he repeatedly purchased kilogram-amounts of cocaine from PIERRE for approximately the past one to two years. Specifically, Dixon stated he purchased approximately four (4) kilograms of cocaine in December 2008, and approximately three (3) kilograms of cocaine in January 2009 from PIERRE. Both the December 2008, as well as, the January 2009 purchases of cocaine took place at the stash house located at 229 NW 9th Street, Pompano Beach, Florida. Dixon went on to state that on a number of occasions prior to December 2008, he purchased cocaine from PIERRE at 1711 NE 2nd Terrace, Pompano Beach, Florida 33060. In addition, Dixon stated that the two (2) additional kilograms of cocaine transported by Dixon and seized on January 26, 2009, were for Jackson, Sr.

13.     In addition, a review of PIERRE'S telephone calls intercepted between January 26, 2009, and February 23, 2009, pursuant to a lawful state court ordered wire intercept, confirmed that PIERRE had additional amounts of cocaine hydrochloride available for sale. During those intercepted telephone calls, PIERRE can be heard stating that he had additional amounts of cocaine available for sale and making arrangements for the sale of cocaine. PIERRE can also be heard on the intercepted telephone calls making arrangements to purchase additional cocaine for large sums of U.S. currency and collecting large sums of U.S. currency from several different subjects.

14.     On May 26, 2009, FRANK PIERRE and JEAN CLAUDY POLANCO were arrested on state drug trafficking charges. I advised FRANK PIERRE of his *Miranda* warnings. FRANK PIERRE acknowledged that he understood his rights, waived his rights and agreed to speak with law enforcement. In a post *Miranda* statement, FRANK PIERRE told me that he has

been buying cocaine hydrochloride from JEAN CLAUDY POLANCO for approximately the past two (2) years. PIERRE explained that in the beginning of his relationship with POLANCO, for approximately the first six (6) months of this two year period of time, he purchased approximately 1-2 kilograms of cocaine hydrochloride per week. After this approximate six (6) month period of time, PIERRE worked his way up to purchasing approximately 20-25 kilograms of cocaine hydrochloride per month from POLANCO. PIERRE also told me that initially he paid POLANCO $22,000.00 per kilogram of cocaine hydrochloride. PIERRE stated that on some occasions he (PIERRE) would pay POLANCO for the cocaine at the time of purchase and on some occasions POLANCO would "front" him the cocaine. On those occasions, PIERRE explained that he (PIERRE) would receive kilogram amounts of cocaine hydrochloride from POLANCO and would then meet POLANCO at a later date to give him the money for the "fronted" cocaine.

15. PIERRE stated that on January 9, 2009, he (PIERRE) received a shipment of approximately fifty (50) kilograms of cocaine hydrochloride from POLANCO. PIERRE stated that a short time after receiving that shipment, approximately one (1) week later, PIERRE sold three (3) kilograms of cocaine hydrochloride to Todd Jackson, Sr. PIERRE further described Todd Jackson, Sr. as a regular customer to whom he sold approximately three (3) kilograms of cocaine hydrochloride at a time on a regular basis. PIERRE also admitted that he sold cocaine hydrochloride to Quentin Dixon on a regular basis. However, PIERRE noted that Dixon purchased one (1) kilogram of cocaine hydrochloride at a time. PIERRE stated that on January 26, 2009, he (PIERRE) sold three (3) kilograms of cocaine hydrochloride to Quentin Dixon. In addition, PIERRE stated that he (PIERRE) knew that a portion of the three (3) kilograms of cocaine hydrochloride were to be delivered to Todd Jackson, Sr. PIERRE admitted that the three

(3) kilograms of cocaine hydrochloride sold to Quentin Dixon on January 26, 2009, came from the fifty (50) kilogram shipment received from POLANCO on January 9, 2009.

16.    Based on the above, I believe that FRANKIE PIERRE and JEAN CLAUDY POLANCO, have committed violations of Title 21, United States Code, Sections 846 and 841(a)(1); conspiracy with intent to distribute cocaine hydrochloride.

Further, your Affiant sayeth naught.

TAMMY ROANE
Special Agent
Florida Department of Law Enforcement

Sworn and subscribed to before me this 27th day of May 2009, in Fort Pierce, Florida.

FRANK J. LYNCH, Jr.
UNITED STATES MAGISTRATE JUDGE