UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 09-CR-14007-MOORE

UNITED STATES OF AMERICA

vs.

FRANK PIERRE,
       Defendant.
_____/

# GOVERNMENT'S RESPONSE TO DEFENDANT'S
# MOTION FOR REDUCTION OF SENTENCE

COMES NOW the United States of America, by and through the undersigned Assistant United States Attorney, and hereby respectfully files this response to the defendant's Motion for Compassionate Release and Reduction of Sentence pursuant to Title 18 U.S.C. §3582.   The defendant asserts that he qualifies for compassionate release due to "extraordinary and compelling reasons" as a result of his medical conditions.   The Government objects to the relief requested for the following reasons: (1) the defendant has been vaccinated against COVID-19 and therefore does not present an extraordinary and compelling reason permitting relief; and (2) moreover the defendant is ineligible for a sentence reduction based on the language contained in U.S.S.G. § 1B1.13, under which a court must abstain from reducing a sentence if a defendant constitutes a "danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g).   The Government also relies upon the pertinent 18 U.S.C. § 3553(a) factors in support of its opposition to the relief requested. As such, the defendant's motion should be denied.   The United States relies on the following factual and legal support for this position.

## FACTUAL BACKGROUND

On November 19, 2008, the Florida Department of Law Enforcement (FDLE), along with the St. Lucie County Sheriff's Office, the State Attorney's Office, the Bureau of Alcohol Tobacco Firearms (ATF), and the Drug Enforcement Administration (DEA), started a state wire intercept on the cellular

telephones of Todd Jackson, Sr., Todd Jackson, Jr. and Quentin Dixon.    Based upon state and federal wire taps, controlled purchases of illegal narcotics, surveillance, confidential informant information, and post arrest statements, the investigation ultimately revealed that a cocaine trafficking organization was operating in Brevard County, St. Lucie County, Palm Beach County, and Broward County, Florida.

Throughout the course of the investigation, it was learned that Todd Jackson, Sr. controlled and was responsible for the distribution of a large amount of cocaine hydrochloride, cocaine base, commonly referred to as "crack" cocaine, and MDMA pills throughout St. Lucie and Brevard Counties. Thousands of telephone calls were intercepted during the investigation, some of which established that Jackson, Sr. had two main individuals, Quentin Dixon and Todd Jackson, Jr., who acted at his direction and assisted with the organization's operations including the purchase and distribution of cocaine. Dixon was captured on hundreds of calls arranging for the purchase, cutting, packaging, and distribution of cocaine hydrochloride, as well as crack cocaine. During those calls, Jackson, Sr. instructed Dixon on how to break open the kilograms of powder cocaine, add cutting material to the cocaine hydrochloride to increase his profit base, how to cook the powder into crack cocaine, and how much his profit base ought to be. Dixon assisted Jackson, Sr. by driving to the source in Broward County to pick up cocaine, delivering the cocaine to Jackson, Sr. and also delivering money from Jackson, Sr. to the source. Jackson, Jr. was also captured on hundreds of calls arranging for the purchase, cutting, packaging, and distribution of cocaine hydrochloride, as well as, crack cocaine. During those calls, Jackson, Sr. clearly used his son as a distributor of cocaine and instructed him on how to work with Dixon to increase his profit margin.

Both Dixon and Jackson, Jr. had individuals who assisted with the distribution of cocaine. David Duvall purchased drugs from Jackson, Jr. and assisted the organization by cooking powder cocaine into crack for distribution, and then distributing the cocaine. Lorenza Harriell assisted Dixon with the

distribution of cocaine and also went with Dixon on at least one occasion to Broward County to pick up cocaine from their source. Harriell also purchased cocaine from Dixon.

The investigation revealed that Michael Lemonious was the source of MDMA pills for both Jackson, Sr. and Jackson, Jr. A number of telephone calls and text messages established the purchase of 500 pills by Jackson, Sr. and the attempted purchase of 500 pills by Jackson, Jr. However, after delivering the pills to Jackson, Sr. and prior to the delivery to Jackson, Jr., Lemonious was arrested by state authorities for trafficking in MDMA.

A number of intercepted telephone calls established that Lemonious arranged for the sale of 616 grams of cocaine hydrochloride to Dixon for $18,500. However, when Dixon traveled to Palm Beach County to pick up the cocaine, the money was stolen from his unoccupied vehicle. Based upon the intercepted telephone calls surrounding this event, it appears that Lemonious had additional individuals present at the pick up location and he was responsible for the theft of the money from Dixon.

In January of 2009, intercepted telephone calls established that Jackson, Sr. and Dixon were making arrangements to purchase cocaine from their source in Broward County. On January 26, 2009, surveillance was established on Dixon, and he was followed to Broward County where he purchased three kilograms of cocaine (according to Dixon, one was for himself and two were for Jackson, Sr.). Surveillance teams followed Dixon back to St. Lucie County. After observing Dixon and Jackson, Sr. arrive at their stash house location at 5007 Sanibel Avenue, Fort Pierce, agents executed a state search warrant for that home. During a search of the residence agents found and seized three kilograms of cocaine powder and a drug ledger. Dixon and Jackson, Sr. were arrested at that time for state drug trafficking charges.

Jackson, Sr. provided a post arrest statement admitting that he sold drugs in the past to supplement his income. He stated he did not bring the kilos recovered during the search of the residence.

3

He stated that if he liked what he saw he probably would have taken the two kilograms to "hustle." As stated in the stipulated factual proffer, he also admitted that members of the narcotic trafficking organization purchased cocaine from him on a regular basis. The members of the organization would then process, package, and distribute the cocaine.

Dixon agreed to speak with law enforcement and advised agents that he transported the cocaine to the residence and the cocaine came from south Florida. He stated that he only purchased one kilogram of cocaine and the other two kilograms of cocaine did not belong to him. He also stated that for approximately the past year or so he had purchased drugs and broken them down to ounce quantities for sale in order to supplement his income.    Dixon agreed to cooperate, and he confirmed he had repeatedly purchased kilogram amounts of cocaine from Frank Pierre over the past one to two years. Specifically, Dixon stated he purchased approximately four kilograms of cocaine in December 2008, and approximately three kilograms of cocaine in January 2009 from Pierre.

During the course of this investigation, Jackson, Sr.'s source of supply was identified as Pierre. On a number of occasions, Jackson, Sr. and Dixon had telephone conversations with Pierre in reference to amounts, delivery dates and prices of cocaine. Arrangements would then be made for the pickup of the cocaine either by Jackson, Sr. or Dixon.    Jackson, Sr. and/or Dixon would purchase their cocaine from Pierre and then transport the cocaine to their "stash locations" in St. Lucie County and Brevard County, to store the cocaine.

A toll analysis of the telephone listings utilized by Jackson, Sr. and Dixon revealed they communicated on a regular basis regarding Pierre. In addition, a review of Pierre's telephone calls intercepted after the arrest of Jackson, Sr. and Dixon, confirmed Pierre had additional amounts of cocaine hydrochloride available for sale. During those telephone calls, Pierre could be heard stating he had additional amounts of cocaine available for sale and making arrangements for the sale of cocaine. Pierre

was also heard making arrangements to purchase additional cocaine for large sums of U.S. currency, and arrangements to collect large sums of U.S. currency from several different persons.

From approximately the end of March until the end of May 2009, intercepted telephone calls establish that Pierre was out of cocaine and he was eagerly attempting to purchase additional kilogram quantities of cocaine. Pierre's source of supply was identified as Jean Claudy Polanco. Intercepted telephone calls established that Pierre was arranging for the purchase of cocaine from Polanco and that Polanco was making arrangements for a large shipment of cocaine from the islands.

On May 25, 2009, intercepted telephone calls confirmed that the shipment of cocaine was going to be delivered on May 26, 2009. On May 25, 2009, a number of conversations were captured between Polanco and Parson Exana during which the following conversations took place. At approximately 3:00 p.m. Polanco asked Exana, "What's the word?" Exana responded, "relaxin, good news?" Polanco stated, "Not yet." Exana stated, "On standby" and asked about a truck. At approximately 10:00 p.m. Exana told Polanco the guys just called and said six a.m. Exana also asked Polanco to find a truck. At approximately 10:55 p.m. Polanco asked Pierre for assistance in locating a van. At approximately 11:00 p.m. Polanco told Exana he found a van and would meet him in the morning.

On May 26, 2009, at approximately 6:00 a.m., Exana told Polanco the guys did not call yet, he would call them right now. Polanco told Exana to call him back. At approximately 6:43 a.m., Exana told Polanco that he just took the freeway and he would call him when he got closer.   Surveillance followed Polanco from Broward County to Jupiter, Florida, and followed the van Polanco had arranged to transport the cocaine. Upon arrival at the Home Depot off of Indiantown Road, surveillance watched Polanco drive around the parking lot a number of times in what appeared to be counter surveillance. Ultimately, Exana arrived at the same location in Jupiter with another individual, Mark Pinder.

During this same time frame, Immigration and Customs Enforcement and DEA agents in West Palm Beach, Florida were investigating the importation of cocaine from the Bahamas using a confidential source (CS). During the course of that investigation the CS introduced an undercover officer (UC) to Mark Pinder. Ultimately, arrangements were made for the importation of hundreds of kilograms of cocaine from the Bahamas to Jupiter by boat. The boat arrived in Jupiter, Florida on the morning of May 26, 2009. Based upon the prior agreement between Pinder and the CS, Pinder and Exana parked a black Expedition, to be used to pick up the cocaine, with the keys still inside the vehicle, in the parking lot of the Dunkin Donuts off of Indiantown Road in Jupiter. Pinder and Exana then went into the Dunkin Donuts. The CS then arrived at that location, got into the Expedition and drove it to a predetermined location. Nine duffel bags containing 297 kilograms of cocaine were loaded into the Expedition. This cocaine was a combination of the cocaine from the instant offense and a second conspiracy in which Exana was involved. At approximately 8:50 a.m., the CS then drove the Expedition to the pre-determined location of the parking lot of the Home Depot off of Indiantown Road in Jupiter, parked the truck and left the area. Pinder and Exana then arrived at the Home Depot parking lot. Exana exited Pinder's car, approached and entered the Expedition. Both Pinder and Exana were then taken into custody and charged with conspiracy to import cocaine in case number <u>09-80063-CR-MIDDLEBROOKS</u> in West Beach, Florida.

During this time frame, Polanco received a call from the driver of the van with whom he had arranged to pick up his portion of the shipment of cocaine. The driver informed him that he was being followed and wanted to meet face to face.   Surveillance observed the face to face meeting between Polanco and the driver of the van. During this meeting the driver of the van again informed Polanco he was being followed. Shortly thereafter, Polanco left the area and drove south at a high rate of speed. Ultimately, on May 26, 2009, both Pierre and Polanco were arrested.

Following his arrest, Pierre admitted he had been buying cocaine hydrochloride from Polanco for approximately the past two years.[1] Pierre explained that in the beginning of his relationship with Polanco, for approximately the first six months, he purchased approximately one to two kilograms of cocaine hydrochloride per week. After the six-month period of time, he worked his way up to purchasing approximately 20-25 kilograms of cocaine hydrochloride per month from Polanco. Pierre stated that on January 9, 2009, he received a shipment of approximately 50 kilograms of cocaine hydrochloride from Polanco.   Pierre also stated that approximately one week later he sold Jackson, Sr. three kilograms of cocaine. Pierre also admitted that Jackson, Sr. and Dixon were regular customers of his. He stated that on January 26, 2009, he sold three kilograms of cocaine to Dixon. In addition, Pierre stated that he knew that a portion of the three kilograms of cocaine hydrochloride were to be delivered to Jackson, Sr., and he admitted that the three kilograms of cocaine hydrochloride sold to Dixon on January 26, 2009, came from the 50 kilogram shipment received from Polanco on January 9, 2009.

In a post arrest statement Polanco admitted to meeting with Pierre at Pierre's residence and making arrangements for the van. He also admitted that he was at the Jupiter location on the morning of May 26, 2009, for Pierre, and to knowing Exana.   He attempted to shift the blame to Pierre by saying that he (Polanco) agreed to introduce Pierre to Exana because Pierre was "hurting."

During the course of this investigation, there were controlled buys of drugs, a number of traffic stops, and several search warrants were executed. As a result of this investigation, in addition to the cocaine seized on May 26, 2009, 3,098 grams of cocaine, 109 grams of cocaine base, over 1,800 suspected MDMA pills, $130,152 in cash, 12 vehicles, and three firearms were seized. The three firearms were seized during the execution of the search warrant at Jackson, Sr.'s home.

---

1 Prior to trial, the defendant filed a motion to suppress his post arrest statement based upon the defendant's invocation of his Fifth Amendment right to counsel.   The Government agreed not to use his statement in its case in chief at trial.

7

## PROCEDURAL BACKGROUND

On January 27, 2009, a complaint was filed, and arrest warrants were issued for Todd Jackson, Sr. and Quentin Dixon. Dixon was arrested on February 10, 2009, and an Indictment was returned on February 12, 2009. A Superseding Indictment was returned on March 19, 2009, as to those two defendants. On April 15, 2009, Todd Jackson, Sr. was arrested. On May 26, 2009, the defendant and Jean Claudy Polanco were arrested and a complaint was filed on May 27, 2009.   On June 4, 2009, a Second Superseding Indictment was filed to include those two defendants, along with Todd Jackson, Jr., David Duvall, Lorenza David Harriell, Michael Lemonious and Parson Exana. Lemonious was arrested on June 8, 2009, Harriell was arrested on July 9, 2009, Todd Jackson, Jr. was arrested on July 10, 2009, and Exana was arrested on July 21, 2009.

On March 4, 2010, the defendant was found guilty by a jury of Counts One and Five of an eight-count Fourth Superseding Indictment. Count One charged the defendant with conspiracy to possess with intent to distribute five kilograms or more of cocaine hydrochloride, in violation of 21 U.S.C. § 846. Count Five charged the defendant with possession with intent to distribute 500 grams or more of cocaine hydrochloride, in violation of 21 U.S.C. § 841(a)(1).   The defendant was found not guilty of Count Six and he was not charged in the other counts of the Fourth Superseding Indictment.   Because the defendant was found guilty by a jury, there was no plea agreement in this case.

As outlined in the Pre-Sentence Investigation Report (PSI), the defendant was involved in the conspiracy from October 1, 2008 until May 26, 2009. He was the source of supply of cocaine for Todd Jackson, Sr., Quentin Dixon, and a number of unindicted coconspirators in his Broward County, Florida organization. He is responsible for at least 447 kilograms of cocaine he received from Polanco. He qualified for a four level increase pursuant to § 3B1.1(a) based on his role as an organizer or leader of a

criminal activity that involved five or more participants.   The defendant was found guilty by a jury and therefore did not received any reduction for acceptance of responsibility.

In preparation for sentencing, the United States Probation Office prepared a PSI which outlined that the guideline for each of Counts One and Five was found in § 2D1.1 and the counts were grouped together pursuant to § 3D1.2(d) because the offense level was determined largely on the basis of the total amount of drugs involved.   The guideline for a 21 U.S.C. §§ 846 and 841(a)(1) offense was found in § 2D1.1(a)(5) of the guidelines. That section provided that an offense involving possession with intent to distribute 150 kilograms or more of cocaine had a base offense level of 38. The defendant was responsible for 447 kilograms of cocaine.   Because a dangerous weapon (including a firearm) was possessed, the offense level was increased by two levels pursuant to § 2D1.1(b)(1).   Because the defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive, the offense level was increased by four levels pursuant to § 3B1.1(a).   As a result, the total offense level was 44.   Pursuant to Chapter Five, Part A, comment. (n.2), in rare cases where the total offense level was more than 43, it was to be treated as an offense level of 43.   The defendant had a total of five criminal history points and a criminal history category of III (Chapter Five, Part A).

As to Count One, the minimum term of imprisonment was ten years and the maximum term was life, pursuant to 21 U.S.C. § 841(b)(1)(A).   As to Count Five, the minimum term of imprisonment was 5 years and the maximum term was 40 years, pursuant to 21 U.S.C. § 841(b)(1)(B).   Based upon the guideline calculations outlined above, the resulting total offense level was 43 and the criminal history category was a III.   As such, the defendant's guideline imprisonment range was life.   On June 7, 2010, the defendant was sentenced to life imprisonment.

The defendant is serving his sentence at FCC-Coleman Medium.   The defendant has three incidents in his disciplinary records provided by Bureau of Prisons (BOP) all of which occurred in 2014.

The defendant failed to stand count, was found guilty of using another inmate's phone account, and fought with another inmate.

On September 15, 2020, the defendant filed an administrative application for a reduction of his sentence.   On March 30, 2021, the Warden at the defendant's institution denied his request.   Thus, the Government agrees that more than 30 days have passed since the defendant's request to the warden, and that he therefore has satisfied the administrative exhaustion requirement set forth in 18 U.S.C. § 3582(c)(1)(A).

## DISCUSSION

As outlined above, the defendant asserts that he qualifies for compassionate release due to "extraordinary and compelling reasons" as a result of his medical conditions and the COVID-19 pandemic.   Specifically, the defendant states that he suffers from obesity, Type II diabetes, hypertension, and sickle cell disease.   The undersigned obtained the defendant's medical records for the past year from BOP, which confirm that the defendant, who is 47 years old, suffers from Type II diabetes mellitus, hypertension, and obesity.[2]   Each of these conditions are listed by the Centers for Disease Control (CDC) as medical conditions that can possibly result in more severe outcomes if one contracts the COVID-19 virus.   However, it appears based upon the defendant's medical records that each of these conditions are well-controlled at this time by the institution, with medication if necessary. Moreover, the defendant is fully ambulatory and engages in all normal activities of daily living (ADLs).

### BOP's Response to the COVID-19 Pandemic

As the Court is aware, from the moment the pandemic began, the BOP made extensive changes to its operations, based on a plan that was prepared over many years, and refined in early 2020 in

---

2  The defendant's medical records also note that he has a "sickle cell trait," rather than "sickle cell disease."

consultation with the Centers for Disease Control and the World Health Organization. Those efforts continue.

The Government recognizes that the COVID-19 case rate at a particular institution may change at any time. We therefore focus primarily on considerations specific to the defendant. But BOP's success at many institutions in limiting the spread of the virus, and in stemming outbreaks when they occur, provides an important backdrop for the defendant's motion.

BOP's "action plan" is described in detail at www.bop.gov/coronavirus/. As part of that plan, all newly arriving inmates are quarantined and not released into the general population until 14 days have passed and the inmate has tested negative; inmate movement within an institution is restricted in order to promote social distancing; mask wearing by inmates and staff is required; all facility staff are screened for symptoms daily; social visiting has been suspended at nearly all institutions; and access by other outsiders is restricted to only those performing essential services, who are also screened before entry.

In addition, acting under the authority granted in the CARES Act, BOP has transferred many thousands of inmates to home confinement, focusing on nonviolent offenders who have served the majority of their sentences.[3] This initiative, combined with the reduced number of new arrivals during the pandemic and the ordinary release of prisoners upon completion of their sentences, has led to a dramatic decrease in the total BOP population, which in turn has increased opportunities for social

---

3  This Court does not have authority to grant a transfer to home confinement, or review BOP's administrative decision regarding that issue. *See* 18 U.S.C. § 3621(b) (BOP's designation decision is not subject to judicial review); *see also, e.g.*, *United States v. Gray*, 2020 WL 6822949, at *2 (E.D. Pa. Nov. 20, 2020) (Sanchez, C.J.); *United States v. Rodriguez-Collazo*, 2020 WL 2126756, at *2-3 (E.D. Pa. May 4, 2020) (Younge, J.); *United States v. Pettiway*, 2020 WL 3469043, at *2 (E.D. Pa. June 25, 2020) (Bartle, J.); *United States v. Torres*, 2020 WL 3498156, at *5-6 (E.D. Pa. June 29, 2020) (Kearney, J.); *United States v. Cruz*, 2020 WL 1904476, at *4 (M.D. Pa. Apr. 17, 2020); *United States v. Mabe*, 2020 U.S. Dist. LEXIS 66269, at *1 (E.D. Tenn. Apr. 15, 2020) ("the CARES Act places decision making authority solely within the discretion of the Attorney General and the Director of the Bureau of Prisons. . . . This Court therefore does not have power to grant relief under Section 12003 of the CARES Act.").

distancing and reduced the strain on BOP resources. The total BOP population, which was approximately 170,000 at the beginning of the pandemic, is now more than 10% lower, at the lowest level in decades.

When an outbreak does occur, any infected inmate is immediately quarantined, and all contacts (including entire housing units if warranted) are tested and quarantined as necessary.   Based upon the inmates' level of illness (asymptomatic, mild or moderate symptoms, severe symptoms, etc.), the BOP follows the recommendations of the CDC as to the length of the quarantine necessary prior to returning the inmates back to general population.

All of these strenuous efforts have been fruitful. To be sure, there is no way to stop this virus short of widespread vaccination, and inmates inevitably will be infected, and some may succumb, just as in the population at large. But it is notable that the rate of deaths in federal prisons as a whole has been lower than that in the general U.S. population, a notable achievement given the known risks of viral spread in a congregate prison setting.

Specifically, as it relates to the defendant, BOP's aggressive efforts have extended to FCC – Coleman Medium.   That institution houses 1,430 inmates.   At present, there are 2 inmates who are reported positive, and are isolated while they are treated/recover.   There are also 317 current inmates who previously tested positive and have recovered. There have been three COVID-related deaths at this institution. The latest statistics are available at www.bop.gov/coronavirus.

## **Vaccinations**

BOP is working with the CDC and the federal Government's COVID-19 Vaccine/Therapeutics Operation (formerly known as Operation Warp Speed) to ensure that BOP receives the COVID-19

vaccine as it becomes available. As of the week of February 8, 2021, doses of the vaccine had been delivered to every BOP institution.

BOP offered the vaccine first to full-time staff because staff members—who come and go between the facility and the community—present a more likely vector for COVID-19 transmission into an institution. As of this time, vaccines have been administered to all willing staff members, and BOP continues to encourage staff members who have not accepted a vaccine to do so. (Staff members may also obtain and have obtained vaccinations from other providers in the community.)

BOP is now in the process of offering vaccines to inmates, proceeding based on priority of need in accordance with CDC guidelines. In general, the vaccine is offered first to inmates over 75 years of age; then to inmates over 65 years of age; then to inmates of any age who present a condition identified by the CDC as presenting a risk of severe COVID-19 disease; and then to all inmates. As of this time, BOP has administered a total of 205,887 doses to staff and inmates nationwide. As of mid-April 2021, BOP estimated that if it continued to receive doses at the then-current pace it will have offered a vaccine to every inmate in its custody by June 1, 2021. As a court recently observed, "Since the vaccines became available, the Bureau of Prisons diligently and efficiently administered the doses allocated to it, leading all jurisdictions and Federal entities in its vaccine utilization rate." *United States v. Roper*, 2021 WL 963583, at *3 (E.D. Pa. Mar. 15, 2021) (Kearney, J.) (footnote omitted).

At FCI – Coleman Medium, where the defendant is held, BOP has fully vaccinated 551 staff members, and 3,839 inmates.   The clinical guidance provided to BOP health services professionals is available at https://www.bop.gov/resources/pdfs/covid19_vaccine_guidance_20210311.pdf. The latest information on BOP's vaccination efforts, including the number of completed vaccinations at each institution, is available at https://www.bop.gov/coronavirus/, and is updated every weekday.

13

### Governing Law

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act

on December 21, 2018, provides in pertinent part:

(c) Modification of an Imposed Term of Imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—

(1) in any case—

(A)  the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i)  extraordinary and compelling reasons warrant such a reduction . . .

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Further, 28 U.S.C. § 994(t) provides: "The Commission, in promulgating general policy

statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall

describe what should be considered extraordinary and compelling reasons for sentence reduction,

including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone

shall not be considered an extraordinary and compelling reason."[4]

The Sentencing Guidelines policy statement appears at § 1B1.13 and provides that the Court may

grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set

forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the

---

[4]  The inmate does not have a right to a hearing. Rule 43(b)(4) of the Federal Rules of Criminal Procedure states that a defendant need not be present where "[t]he proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c)." *See Dillon v. United States,* 560 U.S. 817, 827-28 (2010) (observing that, under Rule 43(b)(4), a defendant need not be present at a proceeding under 18 U.S.C. § 3582(c)(2)).

defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C.

§ 3142(g)."

    In application note 1 to the policy statement, the Commission identifies the "extraordinary and

compelling reasons" that may justify compassionate release. The note provides as follows:

> 1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2) [regarding absence of danger to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A)    Medical Condition of the Defendant.—
>
>     (i)    The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
>     (ii)    The defendant is—
>
>         (I)    suffering from a serious physical or medical condition,
>
>         (II)    suffering from a serious functional or cognitive impairment, or
>
>         (III)    experiencing deteriorating physical or mental health because of the aging process,
>
>     that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B)    Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.
>
> (C)    Family Circumstances.—
>
>     (i)    The death or incapacitation of the caregiver of the defendant's minor child or minor children.

> (ii)    The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D)    Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *See, e.g.*, *United States v. Neal*, 2020 WL 5993290, at *4 (E.D. Pa. Oct. 9, 2020) (Gallagher, J.); *United States v. Adeyemi*, 2020 WL 3642478, at *16 (E.D. Pa. July 6, 2020) (Kearney, J.). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019) (Johnson, J.) (citations omitted).

## COVID-19 and Compassionate Release

The fact of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not alone provide a basis for a sentence reduction. The guideline policy statement describes specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population.   The Third Circuit therefore held: "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *see United States v. Roeder*, 807 F. App'x 157, 161 n.16 (3d Cir. 2020) (per curiam) (not precedential) ("[T]he existence of some health risk to every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner within our Circuit."); *see also United States v. Hegyi*, 2020 WL 7090710, at *2 (N.D. Ind. Dec. 4, 2020) (Van Bokkelen, J.) ("the presence of COVID-19 in a prison, even in large numbers, does not justify compassionate release on its own.").

16

The Government acknowledges, however, that an inmate who has not been offered a vaccine, who presents a risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19, and who is not expected to recover from that condition, presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility" U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I), as, due to his condition, the defendant may be less able to protect himself against an unfavorable outcome from the disease. *See United States v. Tartaglione*, 2020 WL 3969778, at *5-6 (E.D. Pa. July 14, 2020) (Slomsky, J.) ("a prisoner seeking release due to COVID-19 must at least show: (1) a sufficiently serious medical condition, or advanced age, placing the prisoner at a uniquely high risk of grave illness or death if infected by COVID-19; and (2) an actual, non-speculative risk of exposure to COVID-19 in the facility where the prisoner is held" (quoting *United States v. Somerville*, 463 F. Supp. 3d 585, 597 (W.D. Pa. 2020) (Ranjan, J.)).

The CDC's list of risk factors was most recently updated on March 29, 2021. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.   It reports a list of conditions that "can make you more likely to get severely ill from COVID-19." An inmate who has not been offered a vaccine, who presents a condition on that list, presents an "extraordinary and compelling reason" allowing consideration of compassionate release.[5]

---

5   Before March 29, 2021, the CDC presented two separate lists of conditions that either definitively entailed a greater risk of severe illness or "might" entail a greater risk of severe illness. Those "might" conditions were asthma (moderate-to-severe); cerebrovascular disease; cystic fibrosis; hypertension; immunocompromised state from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines; neurologic conditions, such as dementia; liver disease; overweight; pulmonary fibrosis; thalassemia; and type 1 diabetes mellitus. At that time, the government maintained – and most courts agreed – that inmates with conditions on the "might" list did not present an extraordinary basis for relief. *See, e.g.*, *United States v. Durham*, 2020 WL 5577884, at *2 (W.D.N.C. Sept. 17, 2020) (Cogburn, J.); *United States v. Moldover*, 2020 WL 6731111, at *9 (E.D. Pa. Nov. 13, 2020) (Slomsky, J.) ("District courts have routinely denied motions for compassionate release based on allegations of only potential COVID-19 risk factors, including asthma and hypertension."). In the March 29 revision, the CDC merged the two lists without extensive explanation. The CDC also presents a page with information for healthcare providers, which discusses the evidentiary basis

17

## The Defendant's Circumstances

Here, the defendant presents the risk factors of obesity, Type II diabetes, hypertension, and sickle cell disease.[6]   However, he no longer presents an "extraordinary and compelling reason" because he has been vaccinated.   On July 6, 2021, BOP administered to the defendant the Janssen (Johnson & Johnson) vaccine.   Therefore, the defendant is fully inoculated for the COVID-19 virus.   As a result, the defendant's motion for compassionate release should be denied.

As the Government has explained, the pertinent guideline policy statement treats as an "extraordinary and compelling" circumstance "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 app. note 1(A)(ii). The Government during the pandemic has acknowledged that an unvaccinated inmate who presents a medical risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19, and who is not expected to recover from that condition, presents an extraordinary and compelling circumstance under that provision.

That circumstance now does not exist in this case. The defendant has received a vaccine approved by the FDA for emergency use based on its conclusion that "it is reasonable to believe that the Janssen COVID-19 vaccine may be effective to prevent such serious or life-threatening disease or condition that

---

for designating each risk factor and indicates that there remains less extensive support for drawing conclusions regarding most conditions formerly listed as "might" factors. *See* https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-care/underlyingconditions.html. The Government nevertheless continues to follow CDC guidance and therefore relies on the CDC's expanded list to define what constitutes an "extraordinary and compelling" basis for consideration of compassionate release of an inmate who has not been offered a vaccine.   It also bears noting that although age is not listed as a separate risk factor, the CDC has emphasized that it is an important indicator of risk. The CDC page regarding risk factors, updated on March 29, 2021, states: "More than 80% of COVID-19 deaths occur in people over age 65, and more than 95% of COVID-19 deaths occur in people older than 45."

6 While the defendant alleges that he currently suffers from sickle cell disease, BOP's medical records note that he has a "sickle cell trait."   The undersigned does not know if that means that the defendant suffers from sickle cell disease, but that is of no moment as the defendant has received a COVID-19 vaccination and as such his medical conditions no longer constitute an extraordinary and compelling basis necessary for a sentence reduction.

can be caused by SARS-CoV-2." The FDA relied on testing among 40,000 participants in a double-blind trial, measuring the incidence of COVID-19 infection 28 days after vaccination, in which researchers found that the vaccine was approximately 66% effective in preventing moderate to severe COVID-19 and approximately 85% effective in preventing severe COVID-19, and none of the vaccinated participants died of COVID-19. FDA Decision Memorandum – Janssen, https://www.fda.gov/media/146338/download.[7]

Thus, the defendant has provided effective "self-care" against the virus and does not present any extraordinary and compelling reason allowing compassionate release.    As one court recently summarized:

> Here, Defendant is not at high risk of contracting severe COVID-19 because Defendant will have received both doses of the Pfizer vaccine by the time he would be released. According to clinical trials published on the CDC's website, the Pfizer vaccine was 95% effective at preventing COVID-19 in people who did not have a previous infection. More importantly for purposes of this motion, clinical trials have shown that the Pfizer vaccine is 100% effective at preventing severe disease. Therefore, because Defendant will be at little-to-no risk of severe COVID-19 shortly after receiving his second Pfizer dose, there are no "extraordinary and compelling reasons" justifying a compassionate release in this case. *See United States v. Miller*, No. 13-20928, 2021 WL 1115863, at *2 (E.D. Mich. Mar. 24, 2021) ("The court is aware of no scientifically derived evidence showing that severe complications or death from COVID-19 is likely, or even possible, after an individual has received a full vaccination regimen. Over forty million individuals have been fully vaccinated in the United States, and the court does not know of a single confirmed death of a fully vaccinated individual from COVID-19.").

*United States v. Groom*, 2021 WL 1220225, at *2 (S.D. Ohio Apr. 1, 2021) (Sargus, J.).

Recent decisions overwhelmingly agree with this assessment. *See, e.g.*, *United States v. Cortez*, 2021 WL 689923 (D. Ariz. Feb. 23, 2021) (Logan, J.); *United States v. Godoy-Machuca*, 2021 WL 961780, at *2 (D. Ariz. Mar. 15, 2021) (Humetewa, J.) (defendant also recovered from COVID-19,

---

7   On April 13, 2021, the government announced a pause in the administration of the Janssen vaccine to study the circumstances involving blood clots experienced by a few of the 7 million people to receive the vaccine thus far (specifically, six women between the ages of 18 and 48). The problem does not appear to involve the efficacy of the vaccine.

providing an additional measure of protection); *United States v. Grummer*, 2021 WL 568782, at *2 (S.D. Cal. Feb. 16, 2021) (Sabraw, C.J.) (denying compassionate release to defendant with several chronic medical conditions when defendant had been fully vaccinated against COVID-19); *United States v. Poupart*, 2021 WL 917067, at *1 (D. Conn. Mar. 10, 2021) (Arterton, J.); *United States v. Shepard*, 2021 WL 848720, at *5 (D.D.C. Mar. 4, 2021) (Moss, J.); *United States v. Stewart*, 2021 WL 1011041, at *2 (D. Haw. Mar. 16, 2021) (Mollway, J.); *United States v. Decano*, 2021 WL 1095979, at *6 (D. Haw. Mar. 22, 2021) (Gillmor, J.); *United States v. Johnson*, 2021 WL 863754, at *2 (W.D. Ky. Mar. 8, 2021) (Russell, J.); *United States v. Jones*, 2021 WL 1172537, at *2 (E.D. La. Mar. 29, 2021) (Barbier, J.); *United States v. McGill*, 2021 WL 662182, at *5 (D. Md. Feb. 19, 2021) (Gallagher, J.); *United States v. Gabbard*, 2021 WL 1037724, at *3 (E.D. Mich. Mar. 18, 2021) (Cox, J.); *United States v. Williams*, 2021 WL 1087692, at *3 (D. Minn. Mar. 22, 2021) (Frank, J.); *United States v. Burks*, 2021 WL 1291935, at *2 (D. Minn. Apr. 7, 2021) (Magnuson, J.); *United States v. Wakefield*, 2021 WL 640690, at *3 (W.D.N.C. Feb. 18, 2021) (Reidinger, C.J.) (defendant presents obesity, diabetes, and hypertension, but he previously tested positive, and has received the first dose; "Because he has already contracted the virus and recovered without complication, and because he is in the process of being vaccinated, the Defendant cannot meet his burden of establishing that his COVID-19 risk is an extraordinary and compelling reason for his release."); *United States v. Williams*, 2021 WL 966028, at *3 (W.D.N.C. Mar. 15, 2021) (Bell, J.); *United States v. Kosic*, 2021 WL 1026498, at *2 (S.D.N.Y. Mar. 17, 2021) (Crotty, J.) (also rejected other objections based on conditions at Fort Dix, where the inmate received the first dose of the Moderna vaccine, and also recovered from COVID-19); *United States v. Cardoza*, 2021 WL 932017, at *1 (D. Or. Mar. 11, 2021) (Jones, J.); *United States v. Roper*, 2021 WL 963583, at *4 (E.D. Pa. Mar. 15, 2021) (Kearney, J.) ("The risk posed to an inoculated Mr. Roper is not an extraordinary and compelling reason for his release."); *United States v. Stiver*, 2021 WL 1110593, at *1 (W.D. Pa. Mar.

23, 2021) (Bissoon, J.); *United States v. Beltran*, 2021 WL 398491, at *3 (S.D. Tex. Feb. 1, 2021) (Rainey, J.) (denying compassionate release to defendant with underlying health conditions when defendant had received first vaccine dose); *United States v. Ballenger*, 2021 WL 308814, at *4 (W.D. Wash. Jan. 29, 2021) (Settle, J.); *see also United States v. Lipscomb*, 2021 WL 734519, at *2 (M.D. Fla. Feb. 25, 2021) (Chappell, J.) (inmate received both doses; "What's more, this demolishes Lipscomb's conclusory contention BOP is not taking adequate precautions. Currently, tens—if not hundreds—of millions of Americans are scurrying to figure out how to get a vaccine. Yet Lipscomb already received both doses. This does not suggest BOP is taking COVID-19 lightly or not protecting Lipscomb.").

Defendants have contested this consensus, pointing out that the vaccines may not be 100% effective, that they were not tested in a congregate setting, that they may not be effective for all individuals, and that variants may emerge that bypass the vaccines. These courts and others have almost uniformly rejected these arguments. One explained:

> Given that Rodriguez is or will soon be fully vaccinated against COVID-19, the Court concludes that Rodriguez's obesity and hypertension are not extraordinary and compelling reasons justifying his release. . . . Rodriguez argues that it is unclear how effective the Pfizer vaccine is, how long its effects will last, and whether it protects against the COVID variants, leaving a risk that he could still become seriously ill. Although all evidence to date is that the Pfizer vaccine is very effective, no one claims that it is 100 percent effective, and thus there remains a small risk that Rodriguez could be infected by COVID-19 and become seriously ill from that infection. But every prisoner runs a small risk of lots of serious medical conditions (including COVID-19). The small risk that Rodriguez may contract COVID-19 and become seriously ill is simply too speculative to justify his release.

*United States v. Rodriguez*, 2021 WL 1187149, at *1-2 (D. Minn. Mar. 30, 2021) (Schiltz, J.). Accordingly, the prevailing view is that "absent some shift in the scientific consensus, defendant's vaccination against COVID-19 precludes the argument that his susceptibility to the disease is 'extraordinary and compelling' for purposes of § 3582(c)(1)(A)." *United States v. Smith*, 2021 WL 364636, at *2 (E.D. Mich. Feb. 3, 2021) (Ludington, J.); *see also, e.g.*, *United States v. White*, 2021 WL

964050, at *2 (E.D. Mich. Mar. 15, 2021) (Levy, J.) (denied after first dose, and rejects speculation regarding future effectiveness against variants: "Defendant is free to renew his motion should more information emerge suggesting that the Pfizer vaccine cannot protect him from new imminent strains of COVID-19. However, at this time, the Court does not find extraordinary and compelling circumstances based on that speculation."); *United States v. Kariblghossian*, 2021 WL 1200181, at *3 (C.D. Cal. Mar. 29, 2021) (Snyder, J.) ("Nonetheless, at this time, the available scientific evidence suggests that the Pfizer vaccine is highly effective against known variants of the SARS-COV-2 virus that causes COVID-19) (citing CDC studies and Yang Liu, et. al., Neutralizing Activity of BNT162b2-Elicited Serum, The New England Journal of Medicine (March 8, 2021), https://www.nejm.org/doi/full/10.1056/NEJMc2102017?query=featured_home)); *United States v. Goston*, 2021 WL 872215, at *3 (E.D. Mich. Mar. 9, 2021) (Levy, J.) (finding the potential that the Pfizer vaccine does not protect against variants inadequate to justify release); *United States v. Brown*, 2021 WL 1154207, at *3 (S.D.N.Y. Mar. 26, 2021) (Wood, J.) (speculation about variants is insufficient); *United States v. Del Rosario Martinez*, 2021 WL 956158, at *3 n.10 (S.D. Cal. Mar. 10, 2021) (Anello, J.) (declining to rely on a frequently submitted declaration of Dr. Tara Vijayan, stating, "with all due respect to Dr. Vijayan's expertise and experience, the Court declines to contribute in any fashion to public skepticism regarding the safety and efficacy of the available COVID-19 vaccines or to second-guess the Food and Drug Administration's findings and decision to issue Emergency Use Authorizations for COVID-19 vaccines 'for which there is adequate manufacturing information to ensure its quality and consistency.' The Path for a COVID-19 Vaccine from Research to Emergency Use Authorization, available at www.FDA.gov/COVID19vaccines#FDAVaccineFacts (last visited 3/9/2021).").

22

It is possible that the scientific consensus may shift dramatically if vaccine-resistant variants emerge or the vaccines prove less efficacious than studies to date suggest. If those possibilities materialize, nothing would prevent the defendant from filing another motion for compassionate release. *United States v. Singh*, 2021 WL 928740, at *3-4 (M.D. Pa. Mar. 11, 2021) (Brann, J.) ("Indeed, the majority of CDC recommendations for fully vaccinated people indicate that the CDC's primary concern is not with fully vaccinated individuals being hospitalized due to COVID-19, but with such individuals potentially spreading the virus to unvaccinated individuals. . . . It is, of course, possible that future research will demonstrate that current, or future, COVID-19 variants mitigate the effectiveness of the Moderna vaccine to such an extent that the vaccine no longer provides individuals with effective protection. However, Singh has not demonstrated that such is the case today and, it bears emphasizing, the burden falls upon Singh to demonstrate that compassionate release is warranted.").

At this time, this Court's assessment should be driven by the prevailing scientific view that vaccination makes extremely rare, and possibly eliminates entirely, the risk of severe disease from the virus. As inmates are vaccinated, this unprecedented period, in which the threat of the virus sometimes gives rise to "extraordinary and compelling" circumstances, should come to an end, and sentence reductions based on medical conditions once again should be limited to extraordinary conditions that are terminal or severely limit an inmate's ability to function in a correctional setting. *See, e.g.*, *United States v. Willis*, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019) (Johnson, J.) (relief is "rare" and "extraordinary"); *United States v. Lisi*, 440 F. Supp. 3d 246, 251 (S.D.N.Y. 2020) (Failla, J.) ("a defendant's medical condition must be one of substantial severity and irremediability."); *United States v. Polnitz*, 2020 WL 1139836, at *2 (E.D. Wis. Mar. 9, 2020) (Pepper, J.) (must be extraordinary; "Many inmates suffer from pain and mental illness.").   At present, the defendant does not present any such condition.

23

It also bears noting that the defendant contracted COVID-19 and, fortunately, apparently recovered from it without significant consequence. We cannot say that this eliminates all risk, given that there is not yet scientific certainty regarding the risk of reinfection. But in this circumstance, the large majority of courts to address the matter have concluded that the risk is mitigated and compassionate release is not justified, even before vaccination. *See, e.g.*, *United States v. Wiltshire*, 2020 WL 7263184, at *6 (E.D. Pa. Dec. 9, 2020) (Pratter, J.) ("the risk of reinfection after a prior positive test for COVID-19 is a not basis for compassionate release here. Presently, there is no scientific consensus on the risk of reinfection. . . . Moreover, this Court is unable to find a case granting compassionate release to a defendant who recovered from COVID-19 and was asymptomatic. To the contrary, the consensus is that such a circumstance does not warrant release."). A court recently summarized:

> [T]he United States Department of Health and Human Services has stated that "of the millions of patients who have recovered from COVID-19, which is caused by a coronavirus, only a handful have been confirmed as having gotten the disease again. Based on the reported recurrence rate from the early stages of ongoing research, the chances of becoming reinfected appear to be very small." *See* https://combatcovid.hhs.gov/ive-had-covid-19 (last visited December 28, 2020). And a recent study by the University of Oxford and the Oxford University Hospitals NHS Foundation Trust found that those who previously had COVID-19 are highly unlikely to contract the illness again for at least six months following the first infection. *See* https://www.ox.ac.uk/news/ 2020-11-20-prior-covid-19-infection-offers-protection-re-infection-least-six-months# (last visited December 28, 2020). The National Cancer Institute agrees, reporting that the COVID-19 antibody "protective effect is strong and comparable to the protection afforded by effective SARS-CoV-2 vaccines, although developing protection from vaccination is much safer than natural infection. This finding suggests that people who have a positive antibody test result using widely available assays have substantial immunity to SARS-CoV-2 and are at lower risk for future infection." *See* https://www.cancer.gov/news-events/cancer-currents-blog/2020/ coronavirus-antibodies-protect-against-future-infection (last visited December 28, 2020).

*United States v. Pavao-Kaaekuahiwi*, 2020 WL 7700097, at *3 (D. Haw. Dec. 28, 2020) (Seabright, J.); *see also United States v. Carter*, 2021 WL 427110, at *1 (E.D. Pa. Feb. 8, 2021) (McHugh, J.) (relying on the same reports and reaching the same conclusion). Another court expounded: "it is highly unlikely Andrews will be reinfected, and speculative that reinfection would lead to significantly more serious

symptoms than she has already experienced. Further, it is likely that a COVID-19 vaccination will be available relatively soon for inmates in the federal institutions." *United States v. Andrews*, 2020 WL 7714708, at *4 (D. Nev. Dec. 29, 2020) (McKibben, J.); *see also, e.g.*, *United States v. Jenkins*, 2021 WL 665854, at *4 (S.D. Ind. Feb. 19, 2021) (Barker, J.) ("To date, this Court has declined to find extraordinary and compelling circumstances warranting a sentence reduction when a defendant has recovered from COVID-19 – even when that defendant has risk factors for severe symptoms. . .. The fact that the BOP is now actively vaccinating inmates against COVID-19 . . . only underscores the speculative nature of any concern about reinfection."); *United States v. Marley*, 2020 WL 7768406, at *3 (S.D.N.Y. Dec. 30, 2020) (Caproni, J.) ("With the vaccine rollout underway in the United States, the Court anticipates that Mr. Marley will receive a vaccine well in advance of his becoming susceptible to reinfection."); *United States v. Thompson*, 2020 WL 7771141, at *3 (N.D. Ill. Dec. 30, 2020) (Bucklo, J.); *United States v. Palpallatoc*, 2020 WL 7695692, at *3 (W.D. Wash. Dec. 28, 2020) (Settle, J.); *United States v. McCallum*, 2020 WL 7647198, at *1 (S.D.N.Y. Dec. 23, 2020) (Seibel, J.) ("Now that he has weathered the disease, a sentence reduction based on the risk of contracting it no longer makes sense."); *United States v. Purry*, 2020 WL 5909793, at *2 (D. Nev. Oct. 6, 2020) (Dorsey, J.) (the possibility of reinfection does not change an earlier denial of relief; "a possibility that is unconfirmed by science is insufficient to create an extraordinary and compelling circumstance justifying his release.").

For all of these reasons, compassionate release is not warranted here. Further, even if the defendant were at elevated medical risk, relief should be denied. This Court must then consider all pertinent circumstances, including the 3553(a) factors, and possible danger to the community. *See United States v. Doe*, 833 F. App'x 366 (3d Cir. 2020) (per curiam) (not precedential) (summarily affirming the denial of compassionate release, in a case in which the defendant presented medical risk, upon holding that the district court did not abuse its discretion in considering the nature of the offense, the defendant's

history, and the status of the virus at the facility); *United States v. Bullock*, 833 F. App'x 934 (3d Cir. 2021) (per curiam) (not precedential) (granting motion for summary affirmance of denial of compassionate release, as the district court did not abuse its discretion in denying relief for medically vulnerable inmate upon considering the 3553(a) factors, including the substantial time remaining to be served on the sentence and the defendant's criminal history and institutional infractions).

At present, these considerations – including the defendant's risk of danger to the community, his vaccination, and BOP's strenuous efforts to protect inmates against the spread of COVID-19 – counsel strongly against relief.

## The Defendant's Release Poses a Danger to the Community

As amended November 1, 2018, the Commission's policy statement repeats the text of Section 3582(c)(1)(A) and adds that the court should reduce a sentence only if the "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." Per the Sentencing Commission guidelines delineated in § 1B1.13, the defendant is ineligible for compassionate release because he qualifies as an offender who constitutes "a danger to the safety of any other person or to the community" as provided in 18 U.S.C. § 3142(g), thus barring him from receiving a reduced sentence.   Narcotics-related offenses are explicitly covered by the impliedly dangerous criminal offense categories listed in 18 U.S.C. § 3142(g)(1).

The offenses of conviction in this case were very serious and the defendant's role in distributing kilogram quantities of cocaine hydrochloride over an extended period resulting in his being responsible for at least 447 kilograms of cocaine hydrochloride cannot be ignored.   The defendant's serious criminal past, including an Attempted Armed Kidnapping, Attempted Robbery with a Deadly Weapon, and another Attempted Armed Robbery for which he received a global sentence of 9.5 years in prison, is also deeply troubling.

26

The factors set forth in 18 U.S.C. § 3553(a) also weigh against the defendant's release.   Given the seriousness of the offenses for which the defendant was convicted by a jury, the amount of cocaine hydrochloride involved in this drug trafficking conspiracy, the defendant's total lack of accepting any responsibility for his involvement, the international nature of the drug conspiracy, as well as the defendant's possession of a firearm which resulted in an enhancement in his guideline range all militate against the defendant's release.

On May 7, 2021, the Eleventh Circuit, in a published opinion, held that district courts cannot reduce a defendant's sentence unless a reduction would be consistent with the policy statement located at § 1B1.13. *United States v. Bryant*, --- F.3d ----, 2021 WL 1827158, at *1 (11th Cir. May 7, 2021). Pursuant to § 3582, courts may reduce a defendant's sentence "only if 'such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'" *Id*. at *5. Since the First Step Act's enactment, some courts have held that § 1B1.13 no longer applies to defendant-filed 3582 motions. *Id*. In *Bryant*, the Court rejected that view based on, among other things, the statutory context (*e.g.*, § 3582's mandate that the Sentencing Commission, not courts, define what constitutes "extraordinary and compelling" reasons) and general canons of statutory interpretation (*e.g.*, the presumption that the same words have the same meaning within the same statute—"extraordinary and compelling" should not have different definitions depending on whether the Bureau of Prisons or the defendant files a motion). *Id*. at *6–11. The Court also rejected the defendant's argument that § 1B1.13's "catch-all" provision conflicts with § 3582. *Id*. at *13–15. The First Step Act did nothing to alter the BOP's role in § 3582 motions as provided for by Application Note 1(D) (the "catch-all" provision). *Id*. In other words, the "catch-all" provision, though not applicable to defendant-filed motions, still applies to BOP-filed motions. *Id*.

Based on these facts, the Government respectfully submits that the defendant remains "a danger to the safety of any other person or to the community" as provided in 18 U.S.C. § 3142(g) and as such his motion should be denied.

**<u>CONCLUSION</u>**

*WHEREFORE,* based upon the reasons set forth above, the United States respectfully submits that the defendant's motion for a sentence reduction should be denied.

Respectfully Submitted,

JUAN ANTONIO GONZALEZ
ACTING UNITED STATES ATTORNEY

By:   *s/ Jennifer C. Nucci*
Jennifer C. Nucci (FL Bar No. 171700)
Assistant U.S. Attorney
jennifer.nucci@usdoj.gov
500 S. Australian Avenue, Suite 400
West Palm Beach, Florida 33401
TEL: (561) 820-8711
FAX: (561) 805-9846

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 4, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.   I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*s/ Jennifer C. Nucci*
Jennifer C. Nucci (FL Bar No. 171700)
Assistant U.S. Attorney

29

## <u>SERVICE LIST</u>

**UNITED STATES OF AMERICA vs. FRANK PIERRE**
Case No. <u>09-CR-14007-MOORE</u>
United States District Court, Southern District of Florida


**Jennifer C. Nucci**
Assistant U.S. Attorney
jennifer.nucci@usdoj.gov
500 S. Australian Avenue, Suite 400
West Palm Beach, Florida 33401
TEL: (561) 820-8711
FAX: (561) 805-9846
Attorney for the Government
Method of Service: CM/ECF


**Frank Pierre,** *Pro Se*
Federal Correctional Complex
Coleman – Medium
P.O. Box 1032
Coleman, Florida 33521
Method of Service: Regular U.S. Mail